TEXAS FIDELITY & BONDING CO. v. GENERAL BONDING & CASUALTY INS. CO. et al. (No. 7456.)*

(Court of Civil Appeals of Texas. Dallas. Feb. 5, 1916. Rehearing Denied March 11, 1916.)

1. CORPORATIONS ⬛484(2)—POWERS OF CORPORATION—"INDEMNITY."

A corporation organized under Rev. St. 1911, art. 4928, empowering such corporations to guarantee contracts between individuals, corporations, as well as the state and municipal corporations or counties, has no authority to make a contract of indemnity which is an engagement to make good and save another from loss upon some obligation which he has incurred or is about to incur to a third person, and is an independent agreement instead of collateral to some principal undertaking as is a contract of guaranty or suretyship.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1815; Dec. Dig. ⬛484(2).

For other definitions, see Words and Phrases, First and Second Series, Indemnity.]

2. CORPORATIONS ⬛484(2)—POWERS OF CORPORATIONS—ULTRA VIRES.

A corporation authorized by law to enter into contracts of guaranty cannot justify the making of indemnity contracts on the theory that they fall within its implied powers, and such a contract is ultra vires.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1815; Dec. Dig. ⬛484(2).]

3. CORPORATIONS ⬛388(2) — ULTRA VIRES ACT—ESTOPPEL.

Defendant, a Texas corporation, authorized only to do a guaranty business, entered into an indemnity contract with plaintiff, another Texas corporation authorized to do a similar business. Held that, notwithstanding defendant received compensation under such contract, it was not estopped to urge the ultra vires character of the contract, for plaintiff must have had knowledge of the limitations of defendant's powers.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1557; Dec. Dig. ⬛388(2).]

Appeal from District Court, Dallas County; Kenneth Feree, Judge.

Action by the Texas Fidelity & Bonding Company against the General Bonding & Casualty Insurance Company and others.

From a judgment in favor of the corporate defendant but against the individual defendants, plaintiff appeals. Affirmed.

Etheridge, McCormick & Bromberg, of Dallas, for appellant. W. D. Cardwell, T. L. Camp, and W. J. J. Smith, all of Dallas, for appellees.

RAINEY, C. J. This was an action on three indemnity bonds, executed for value to insure appellant against the consequences of its becoming surety on three criminal bail bonds required by a court in Louisiana, to recover the losses sustained by appellant as such surety. The case was tried before the court without a jury, and resulted in a judgment in favor of the plaintiff against the individual appellees, but in favor of the corporate appellee.

Appellant pleaded, in substance: That on and prior to May 7, 1913, A. C. Karslake was in jail in the parish of Morehouse, state of Louisiana, where he was being held under three informations charging him in one with the crime of burglary and in two with the offense of grand larceny, and that his bail had been fixed in the burglary case at $3,000, and in the grand larceny cases at $1,000 each. That the appellant, at the instance of the appellees, and induced so to do by the execution and delivery to it by appellees of three instruments of indemnity by which the appellees agreed to hold appellant harmless against the consequences of the execution of said bonds as to all demands, liabilities, expenses, and attorney's fees that it might suffer thereby, executed the bail bonds as surety for Karslake. That Karslake who was released by reason of the bonds on which appellant became surety, afterwards defaulted, and that the bonds were forfeited, and judgment rendered against appellant on said bonds, which judgment had been paid off by the appellant in the sum of $5,046.52, and that it had been required to pay attorney's fees, in Louisiana of $50, and for bringing this suit of $750. The appellees filed their original answer, consisting of a general demurrer, a general denial, and W. W. Nelms, appellee, filed no other pleadings. On October 22, 1914, the corporate appellee filed an amended answer, on which the case was tried, consisting of a general demurrer and general denial; certain specific denials and denials of information; and a plea that the contracts sued on were void for want of corporate power to execute them; and a plea that said defendant was a corporation organized under the laws of Texas for the purpose of doing a surety, casualty, and liability insurance business, and none other, and was at the time of the execution of said alleged contract engaged in the business of a surety company, and that it was not authorized or empowered to do business in the state of Louisiana at the time of the execution and

delivery of the alleged contracts, which fact was well known to the plaintiff, and that the contracts were void in law as between the parties thereto, for the want of authority and corporate power on the part of the corporation defendant to make and enter into the alleged contracts which were, and each of them was, in excess of and in violation of the charter conferring corporate powers on said appellee and of the purposes of its incorporation; that these facts were known to the appellant at the time of the execution of the alleged contracts.

The foregoing statement of the pleading is taken from appellant's brief, which the appellees adopt, as well as the conclusions of fact of the trial court, which conclusions are as follows:

"I. I find that on the 7th day of May, 1913, A. C. Karslake was in custody of the sheriff of the parish of Morehouse, state of Louisiana, at Monroe, La., under warrants issuing on informations in three cases charging him in two of the cases with grand larceny and in the other with burglary, and that bail had been fixed in the sum of $3,000 in the burglary case, and in the sum of $1,000 for each of the grand larceny cases, copies of which said bail bonds are hereto annexed and made a part hereof, and marked 'Exhibits A,' 'B,' and 'C.'

"II. I find that on the 15th day of May, 1913, the defendants W. W. Nelms and A. U. Puckett executed the instruments on which they are sued herein, and that on the 7th day of May, 1913, the defendant General Bonding & Casualty Insurance Company executed the instruments on which it is sued herein, all of which instruments are of identical verbiage, except the signature and date, one being signed by both W. W. Nelms and A. U. Puckett in each of the three cases, and one being signed by General Bonding & Casualty Insurance Company in each of the three cases. The instruments, omitting dates and signatures, are as follows:

" 'Texas Fidelity & Bonding Company.

" 'This agreement witnesseth: That whereas, we, the undersigned, have requested the Texas Fidelity & Bonding Company, a corporation, under the laws of the state of Texas (hereinafter called the company) to sign and execute a certain bond or undertaking on behalf of A. C. Karslake, reference to which is hereby made for the purpose of certainty, and a copy of which instrument is or may be hereto attached; and whereas, the company has signed and executed, or is about to sign and execute the said instrument upon condition of the security and indemnity hereby and herein provided:

" 'Now, therefore, in consideration of the premises and of the sum of one dollar in hand paid to us by the company, the receipt whereof is hereby acknowledged, we the undersigned, hereby covenant and agree with the company, in manner following:

" 'First. That we will pay in cash to the company at its principal office in the city of Waco, Texas, for the execution of the said instrument, the annual premium or charge of one hundred and no-100 dollars, to be paid annually in advance on the ——— day of ——— in each and every year during the time the company shall be and continue liable upon the said instrument, and all matters arising therefrom and until there shall have been furnished to the company, at its principal office in the city of Waco, Texas, due and satisfactory proof, by evidence legally competent, of such discharge and release.

" 'Second. That we will at all times indemnify and keep indemnified the company and hold and save it harmless from and against any and all demands, liabilities and expenses of whatsoever kind or nature, including counsel and attorney's fees, which it shall at any time sustain or incur by reason or in consequence of having executed the said instrument; and that we will pay over, reimburse and make good to the company, its successors and assigns, all sums and amounts of money which the company or its representatives shall pay or cause to be paid or become liable to pay, under its obligation upon said instrument, or as charges and expenses of whatsoever kind or nature, including counsel and attorney's fees by reason of the execution thereof, or in connection with any litigation, investigation or other matters connected therewith, such payment to be made to the company as soon as it shall have become liable therefor, whether it shall have paid out said sum or any part thereof, or not. That in any settlement between us and the company the vouchers or other proper evidence showing payment by the company of any such loss, damage or expense, shall be prima facie evidence against us of the fact and amount of our liability to the company, provided that such payment shall have been made by the company in good faith believing that it was liable therefor.

" 'Third. That in case any action at law, suit in equity or other proceeding be commenced or notice of such action, suit or proceeding be served upon the undersigned affecting the liability of the company upon said instrument, or growing out of any matter connected therewith, or on account of which the said instrument was given, we will immediately so notify the company at its principal offices in the city of Waco, Texas.

" 'Fourth. The company may at any time hereafter take such steps as it may deem necessary or proper to obtain its release from any and all liability under the said instrument, or under any other instrument within the meaning of section fifth hereof, and to secure and further indemnify itself against loss and all damages and expense which the company may sustain or incur or be put to in obtaining such release, or in further securing itself against loss shall be borne and paid by us.

" 'Fifth. That no act or omission of the company in modifying, amending or extending the instrument so executed by the company shall in any way affect our liability hereunder, nor shall we or any of us be released from this obligation by reason thereof, and we agree that the Company may alter, change or modify, amend, limit or extend said instrument and may execute renewal thereof, or other and new obligations in its place or in lieu thereof, and without notice to us, notice being expressly waived, and in any such case we and each of us shall be liable to the company as fully and to the same extent on account of any such altered, changed, modified, amended, limited or extended instrument, or such renewals thereof, or other new obligations in its place or in lieu thereof, whenever and as often as made, as fully as if such instrument were described at length herein.

" 'Sixth. That it shall not be necessary for the company to give us, or either of us, notice of any act, fact or information coming to the notice or knowledge of the company concerning or affecting its rights or liability under any such instruments by it so executed, or our rights or liabilities hereunder, notice of all such being hereby expressly waived.

" 'Seventh. That this agreement shall bind not only the undersigned jointly and severally, but also our respective heirs, executors, administrators, successors and assigns (as the case may be), until the company shall have executed a release under its corporate seal, attested by the signature of its officers proper for the purpose.

" 'Eighth. That these covenants, as also all collateral securities or indemnity, if any, at any

time deposited with or available to the company concerning any bond or undertaking executed for or at the instance of us, or any of us, shall, at the option of the company, be available in its behalf and for its benefit and relief as well concerning any or all former or subsequent bonds or undertakings executed for us, or at the instance of us, or any of us, as concerning the bond, or undertaking such covenants, collateral securities or indemnity shall have been made, deposited or given.

"'In testimony whereof we have hereunto set our hands and affixed our seal this ―――― day of ――――, 19――.

"'Signed, sealed and delivered in the presence of'

"III. I find that during the month of May, 1913, the plaintiff had so complied with the laws of Louisiana that it was accepted as surety on bonds in the courts of Louisiana, and that the defendant General Bonding & Casualty Insurance Company had not so complied with the laws of Louisiana and was not acceptable as surety on bail bonds in the courts of that state.

"IV. I find that the contracts sued on were delivered to the plaintiff, and that after such delivery and the payment to the plaintiff of $100 by Karslake the plaintiff became surety on the bail bonds of Karslake in the three cases in which bail had been fixed as aforesaid, and in the amounts of the bail so fixed, and that Karslake was enlarged upon the giving of said bail bonds.

"V. I further find that the said Karslake failed to appear in either case as required by his bond, and that the bonds were forfeited and judgment final rendered against the plaintiff in each of the cases, which judgments aggregated the sum of $5,000; that interest ran on them at the rate of 5 per cent. per annum from January 6, 1914, to March 13, 1914, which interest amounted to $46.52 and that on March 13, 1914, the plaintiff duly paid off and discharged said judgments by paying thereon the sum of $5,046.52; copies of said judgment respectively upon said respective bail bonds, together with all notices issued thereon, are hereto attached, and marked 'Exhibits D,' 'E,' 'F,' 'G,' 'H,' 'I,' and 'J.'

"VI. I further find that, when plaintiff was advised that the judgments had been rendered against it the plaintiff employed an attorney named J. Zack Spearing, of New Orleans, La., to investigate the validity of said judgments and advise it as to its liability thereon, and that the plaintiff paid the said J. Zack Spearing on the 20th of March, 1914, the sum of $50 as compensation for his services rendered in that matter, which is a reasonable charge for said services.

"VII. I further find that, before the institution of this suit, the plaintiff employed the law firm of Etheridge, McCormick & Bromberg to institute and prosecute this suit to final determination, for which services the plaintiff agreed to pay said attorneys the sum of $750, which is a reasonable charge for said services.

"VIII. I find that General Bonding & Casualty Insurance Company was duly incorporated under the laws of the state of Texas on the 30th day of November, 1910, 'for the purpose of transacting (1) all kinds of surety business, and (2) all kinds of casualty insurance business, and (3) all kinds of liability insurance business.'

"IX. I find that A. C. Karslake paid the defendant General Bonding & Casualty Insurance Company the sum of $100 for the execution and delivery to the plaintiff of the contracts sued on, which sum the defendant General Bonding & Casualty Insurance Company still retains; and I find that this payment was made under substantially the following circumstances and conditions: The said A. C. Karslake had been arrested and imprisoned under warrants issuing in the three cases mentioned in plaintiff's petition, and

hereinbefore mentioned, and had employed the defendants Nelms and Puckett to represent him as attorneys at law in defense of the charge against him, and to procure him bail bonds for his enlargement until the trial. That the said Nelms and Puckett applied to the agents of the plaintiff at Dallas to become surety on said bail bonds. That the plaintiff agreed to do so upon being indemnified for so doing by the said defendants Nelms and Puckett and the defendant General Bonding & Casualty Insurance Company, and not otherwise; and then the said defendants Nelms and Puckett, or one of them acting for the said A. C. Karslake, procured the defendant General Bonding & Casualty Insurance Company the sum of $100 for so doing, and that said General Bonding & Casualty Insurance Company then delivered the contracts signed by it, herein sued on, to the plaintiff, whereupon the plaintiff executed the bail bonds mentioned in the plaintiff's petition, and thereby procured the enlargement of the said A. C. Karslake; and that because the plaintiff had, and the defendant General Bonding & Casualty Insurance Company had not, complied with the laws of Louisiana, the contracts of said General Bonding & Casualty Insurance Company to the plaintiff were executed and delivered to induce the plaintiff to execute as surety said bail bonds.

"X. At the time of the execution of the indemnity contract executed by the General Bonding & Casualty Insurance Company, F. B. Wortman was vice president and treasurer and also underwriting manager of the Texas Fidelity & Bonding Company, plaintiff in this cause, and it was his duty to supervise and pass on bonds that were executed by plaintiff, including bail bonds, and he did pass upon and approve the bail bonds given for Karslake. I find that the plaintiff, through its said vice president and treasurer and supervisor of bonds, F. B. Wortman, was acquainted with the General Bonding & Casualty Insurance Company, one of the defendants, at that time. Both plaintiff and defendant bonding companies were organized under the laws of the state of Texas, and, at the time that the plaintiff accepted said indemnity contracts from the defendant bonding company, the plaintiff's home office was at Waco, Texas, and plaintiff and defendant bonding companies were competitors in business, and plaintiff, through said Wortman, knew that defendant bonding company was a Texas corporation organized under the laws of Texas and knew that the defendant company was a bonding company, and that it acted as a surety company, and understood that it was organized under the laws of Texas."

There being no controversy as to what the facts are the controversy arises upon what are the legal conclusions to be drawn from the facts adduced.

[1] Practically but two points are raised, and they are: (1) Was the contract entered into by appellee ultra vires? (2) If so, was appellee estopped by reason of having accepted a valuable consideration therefor? Appellee was incorporated under the laws of Texas, R. S. art. 4928, and was empowered to "guarantee any contract or undertaking between individuals, or between private corporations, or between individuals or private corporations and the state and municipal corporations or counties, or between private corporations and individuals"; but no authority is granted it by law to make contracts of "indemnity." Contracts of indemnity are different from those of guaranty and suretyship, and are distinguishable, "in that in ordinary contracts the-

engagement is to make good and save another from loss upon some obligation which he has incurred or is about to incur to a third person, and is not, as in guaranty and suretyship, a promise to one to whom another is answerable." 22 Cyc. 80.

Again, it is said in 20 Cyc. p. 1402:

"There are important differences between a contract of guaranty and one of indemnity. The former being a collateral undertaking presupposes some contract or transaction as principal thereto; while a contract of indemnity is original and independent, to which there is no collateral contract and with respect to which there is no remedy against the third party. As contracts of indemnity are not required by the statute of fraud to be in writing, while contracts of guaranty must be evidenced by a sufficient writing in order to be enforceable, the courts have been frequently called upon to determine whether parol contracts belong to the one class or to the other."

There being a difference between the two contracts, and appellee's charter not authorizing the making of indemnity contracts, it follows that said contracts are ultra vires.

[2] But appellant contends that:

"As appellee was chartered for the purpose of transacting all kinds of surety business, and all kinds of liability insurance business, it had full power, when compensated therefor, to execute and bind itself by the contract sued on, and to enter into any obligation or contract essential to the transaction of its authorized business."

It is true that it has been held that corporations have "implied power to do whatever is necessary or reasonably appropriate to the exercise of the authority expressly conferred." It is hard sometimes to determine whether or not the act done by the corporation falls within its implied powers, and it is not easy to lay down a rule to govern in every case; but we think the remarks of Mr. Chief Justice Gaines in Railway Co. v. Worthington, 88 Tex. 562, 30 S. W. 1055, 53 Am. St. Rep. 778, are applicable here, as follows:

"But the following, as announced by a well-known text-writer, commends itself not only as being reasonable in itself, but also as being in accord with the great weight of authority: 'Whatever be a company's legitimate business, the company may foster it by all the usual means; but it may not go beyond this. It may not, under the pretext of fostering, entangle itself in proceedings with which it has no legitimate concern. In the next place, the courts have however, determined that such means shall be direct, not indirect; i. e., that a company shall not enter into engagements, as the rendering of assistance to other undertakings from which it anticipates a benefit to itself, not immediately, but immediately by reaction, as it were, from the success of the operations thus encouraged—all such proceedings inevitably tending to breaches of duty on part of the directors, to abandonment of its peculiar objects on part of the corporation.' Green's Brices' Ultra Vires, 88. In short, if the means be such as are usually resorted to and a direct method of accomplishing the purpose of the incorporation, they are within its powers. If they be unusual, and tend in an indirect manner only to promote its interests, they are held to be ultra vires."

The charter of appellee did not grant it power to enter into an "indemnity" contract as was here entered into, but was an indirect method of enlarging its business and unauthorized.

[3] It is also contended by appellant that as appellee entered into the indemnity contract, and though ultra vires, it is estopped from setting up its want of power by reason of having received benefit thereof.

Appellant and appellee were chartered under the laws of Texas, granting them power to transact the same kind of business, and each knew, or ought to have known, the authority of the other to enter into such contracts; therefore we think no such equities exist as to invoke the doctrine of estoppel. The contract was clearly outside the charter powers and was void. The principle governing this case is in accord with that announced in Fidelity & Deposit Co. v. Bank, 48 Tex. Civ. App. 301, 106 S. W. 782, in which this court adopted the following from Transportation Co. v. Pullman Co., 139 U. S. 59, 11 Sup. Ct. 488, 35 L. Ed. 55, to wit:

" 'A contract of a corporation, which is ultra vires in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it.' It must be borne in mind that we are speaking of acts that are ultra vires absolute—that is, such as are 'beyond the powers of the bank for any purpose and under all circumstances—and not acts that are ultra vires by circumstances, or such as are beyond its authority for some purposes or under some circumstances, but are within its power under other circumstances or for other purposes.' We regard the acts involved in this controversy to be of the character first named."

The courts do not look with favor upon the plea of ultra vires, but, when invoked in a proper case, it must be considered and the principle applied as in other cases, as said in McCormick v. Bank, 165 U. S. 538, 17 Sup. Ct. 433, 41 L. Ed. 817:

"The doctrine of ultra vires, by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void, and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: (1) The obligation of any one contracting with a corporation, to take notice of the legal limits of its powers; (2) the interest of the stockholders, not to be subject to risks which they have never undertaken; (3) and, above all, the interest of the public, that the corporation shall not transcend the powers conferred upon it by law."

The appellant cites many cases where the defense of estoppel has been invoked, but we think in those cases the facts were different from those in this case, and the equities therein were so strong as not to be disregarded; while in this case the two corporations having similar charters under the laws of Texas they should have known, if they did not, that the powers granted to them by

their charters and their contracts were not within the scope of their authority and void, hence the plea of estoppel cannot prevail in order to enforce said contract and give appellant relief.

The judgment is affirmed.